[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12735
Non-Argument Calendar

_____

D.C. Docket No. 1:17-cr-00035-DHB-BKE-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AUDRA ROPER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(January 29, 2020)

Before MARTIN, ROSENBAUM, and ANDERSON, Circuit Judges.[1]

PER CURIAM:

---

[1] We withdraw our opinion issued on November 14, 2019, and replace it with this one. Accordingly, we **GRANT** Roper's motion for clarification and **DENY AS MOOT** her motion to stay the mandate.

Audra Roper appeals her 11-month sentence imposed as a result of the revocation of her probation, pursuant to 18 U.S.C. § 3565(a)(2), after initially pleading guilty to being an accessory after the fact to bribery, in violation of 18 U.S.C. §§ 3, 201(c).  Roper makes four main arguments on appeal: (1) the district court violated her procedural due process rights by relying on evidence it did not disclose to her; (2) the district court committed a *Jones*[2] violation by failing to elicit objections at her probation revocation hearing after imposing her sentence; (3) the district court erred in concluding that she violated one of the conditions of her probation because it relied on clearly erroneous factual findings; and (4) her sentence was procedurally and substantively unreasonable.

After reviewing the record, we determine that the district court committed reversible error in two respects: (1) by violating Roper's procedural due process rights; and (2) by failing to elicit objections, in violation of our holding in Jones. Accordingly, we vacate the district court's revocation decision and Roper's sentence and remand this case to the district court to conduct a new revocation hearing and for resentencing.[3]

## I. BACKGROUND

---

[2] United States v. Jones, 899 F.2d 1097 (11th Cir. 1990), overruled on other grounds by United States v. Morrill, 984 F.2d 1136 (11th Cir. 1993).

[3] We need not address Roper's last two arguments because, upon remand, the district court's revocation hearing and subsequent resentencing, if it again determines that Roper violated the terms of her probation, may well affect the issues raised.  Of course, if Roper is adjudicated to have violated the terms of her probation, she may again appeal on these—or any other—grounds.

Audra Roper and her husband, Anthony Roper, were indicted on charges related to their taking of nearly $200,000 in bribes in exchange for "steering millions of dollars' worth of government contracts" to the party bribing them. The Ropers failed to report these bribes on their 2013 and 2014 tax returns and did not file tax returns at all in 2015, 2016, and 2017.

Audra pleaded guilty to being an accessory after the fact to bribery, in violation of 18 U.S.C. §§ 3, 201(c), and Anthony pleaded guilty to one count of procurement integrity fraud, in violation of 42 U.S.C. § 2102(a). The Presentencing Investigative Report calculated Audra's guidelines range as between 24–30 months' imprisonment, but because the statutory maximum term of imprisonment was one year, the PSI reduced the guideline term of imprisonment to just 12 months. Audra initially objected to several paragraphs of the Presentencing Investigative Report prior to sentencing but withdrew all of those objections at the sentencing hearing. Anthony maintained his objections to the PSI—including that the payments he received were not "bribes," because his conduct would have been the same "whether he got paid or not." The District Court overruled his objection and concluded that "the word 'bribe' is most appropriate."

Audra and Anthony Roper were sentenced together on January 3, 2019. Anthony was sentenced to 60 months imprisonment, followed by 3 years of supervised release. Audra was sentenced to 5 years of probation and was required

to spend seven four-day weekends incarcerated during her probation.  The District Court also required both Audra and Anthony to hire "appropriate professionals to bring a semblance of order to their financial obligations."  It added a special condition—denoted as Special Condition 9—which stated:

> You must, as soon as practicable, engage appropriate professionals to compile information, prepare tax returns, and file tax returns for the years in which no returns have been filed and to amend the returns of prior years to the extent required by law. The Court expects faithful compliance with this requirement and cooperation with the Internal Revenue Service. Further, you must proceed as soon as practicable to amend tax returns for the years in which illicit payments were received to achieve full compliance with federal laws and regulations. If the Court detects any willful delay or recalcitrance in complying with this requirement, the Court will consider revocation of probation.

Five days later, the District Court held a follow-up sentencing hearing regarding unrelated contemptuous conduct on Anthony Roper's part.  There, the court reiterated that a "careful plan" for Audra's probation was the best way to handle the "important" issue of their taxes, because it deemed it "absolutely necessary" that the Ropers amend their prior tax returns to "include the illicit payments received," as well as prepare tax returns for the missing years.  It also emphasized the importance of the Ropers obtaining professional assistance in amending and filing their taxes.  The district court also discussed a remark Anthony had apparently made to Audra's probation officer that he was not required to file any tax returns.  The court viewed this statement as "an intention[,]

4

perhaps as well as an instruction to his wife[,] not to comply with the [c]ourt's directives relative to tax preparation and amendment."

About six months later, on June 21, 2019, Baylon Thomas, Audra Roper's probation officer, charged her with violating Special Condition 9. Thomas essentially alleged as follows. On June 13, Audra Roper indicated to the probation office that she had met with Platinum Tax Associates in College Park, Georgia; filed tax returns with the IRS for the 2015–18 years; and accordingly, believed she had fulfilled the special condition. Additionally, by this point, she had fulfilled the district court's requirement of brief terms of weekend imprisonment. Audra submitted to the Probation Office a letter from one of Platinum's senior accountants, Derrick Mathews, stating that the Ropers had filed tax returns for the 2015–18 years (which fulfilled that component of Special Condition 9) and had additionally asserted that the payments they had received were gifts, not bribes, and therefore, that they didn't need to amend their returns. Thomas concluded that this assertion was "untruthful and contrary to" both Audra's conviction and established IRS guidance for reporting bribes on tax returns.

On June 25, the District Court ordered an investigation, deputizing Joel Ozburn, a retired IRS special agent, to subpoena Mathews, interview him, and produce "all appropriate books, papers, and records" from Platinum. The court scheduled a revocation hearing for July 10, 2019 and requested that Mathews and

5

Ozburn attend the hearing and testify.  At this point, Roper reached out to Mathews again, and asked him to prepare returns for 2008–14 that reported the bribes as income.  She said something to the effect of, "I know Tony is still trying to work something out, but go ahead and file the amendments and I'll pay you for doing the amendments."  She texted him and reported the amounts of the bribes as "200 and something thousand," which *overreported* their approximate value of $199,000.  Edwards prepared the returns but hadn't yet filed them because he needed the signatures of both Ropers, and had not presented them to Audra at all.  Upon receiving the summons and speaking with Ozburn, he decided to bring the tax returns with him to the hearing, which he told Audra.

At the revocation hearing, Thomas reiterated the relevant portions of the initial sentencing hearing, including Audra's withdrawal of her objections to the PSI and that the District Court determined that the payments were bribes in overruling Anthony's objection.  He said that Audra had left the letter in question from Platinum at the front desk of the Probation Office and he discussed it with her the next day.  During that conversation, she told him that the payments were gifts and that no amended returns were required.  He further testified that in a meeting with both Anthony and Audra, Anthony was extremely opposed to the idea of filing amended returns, and that he wouldn't do it.

6

Ozburn testified about his knowledge of tax law and his visit to Platinum's office. First, he testified that gifts weren't taxable, but bribes were. He noted that the signatures of both spouses were required to file jointly, but that he hadn't ever faced a situation where one spouse wished to amend prior tax returns and the other refused to. Second, he described his visit to Platinum. He noted that the employees were separated from the lobby by what he concluded was "bullet-proof glass." When he provided Mathews with the subpoena, Mathews had him walk through a different entry door to meet in his office. Ozburn didn't see any credentials indicating that anyone at Platinum was a certified public accountant.

Mathews, the managing partner of Platinum, then testified. He said that he was unfamiliar with the Ropers and hadn't spoken to them. The letter in his name had been drafted by Michael Edwards, another employee. The following back-and-forth took place between the court and Mathews:

THE COURT:      How long have you known Mr. Edwards?

THE WITNESS:   Since 1998.

THE COURT:      All right. **So you know what all went on in 2002, 2003?**

THE WITNESS:   **Yes, uh-huh.**

THE COURT:      **Is that one of the reasons you're the ERO and he is not one?**

THE WITNESS:   **That's one of the reasons, yeah.**

7

THE COURT:  Okay. Now what is the bulk of your business at Platinum? Is it earned income tax credit type of returns?

THE WITNESS:  I don't -- I have never done a breakdown. We do a lot of them, but it's not the bulk of them. Because of the demographic of our office we have probably a 50 to $60,000 average income per household. We do a lot of earned income returns. It is like any office in any metropolitan area.

THE COURT:  **Is that the primary thrust of your Facebook advertisement?**[4]

THE WITNESS:  No. I mean, I didn't do the Facebook ad. The Facebook ad is not even current. I don't know if I have looked at the Facebook ad two or three times this year.

THE COURT:  Okay.

THE WITNESS:  The Facebook ad -- I mean, I am not sure what you're saying.

THE COURT:  Well, you're familiar with this?

THE WITNESS:  Yes. Somebody did this as a -- this is a card. This is our promo card and so we just took a picture of the promo card and put it on Facebook. I don't think there is anything else with this. This was a marketing thing we did at one point and there is a flip side of this card as well which is not on this, but this was a part of this promotion that we did.

THE COURT:  All right.

---

[4] The Facebook ad first appeared as an attachment to the memorandum prepared by Thomas sent to the district court that summarized his conversation with Roper and the additional research that he conducted.

(emphasis added).

Edwards then testified. He had only met with Audra one time in person and otherwise spoke with her and Anthony over the phone. He specifically remembered speaking to Anthony because his comments—that he was opposed to filing returns at all—were "quite distinctive." When Audra dropped off the Ropers' paperwork at Platinum, she said something to the effect of: "My husband will contact you because I don't know anything about these returns or what he wants done to them. He will call you and give you his version of what he wants to happen with these tax returns and this paperwork." Audra later informed him, "Tony said these are gifts." Edwards then drafted the letter in question. Edwards then testified that, two days before the hearing, Audra contacted him again and asked him to prepare corrected tax returns for 2008–14 reporting the bribes as income, not gifts, which he did.

The parties then submitted their arguments. Audra's counsel essentially argued that Anthony never had any intention of filing amended returns, which put Audra "in a bad position." He argued that she was "doing everything that she can" and opined that she wouldn't have attempted to file amended returns absent the revocation hearing, which prompted her to realize the error of her actions. The Government argued that Audra understood the court's directive—both because she

9

was an intelligent, educated person and because she raised no questions with her probation officer.

The District Court observed that Audra had adopted Anthony's conduct and views regarding filing amended taxes and that she had betrayed the leniency that the court offered. It continued:

> She can blame it on [Anthony]. She can go to Edwards[,] whom I would hardly consider an appropriate tax professional, but she can go to Edwards and say "Tony said these are gifts" after she had sat in the courtroom for seven hours, after she told me solemnly in court that she had no objection[s] to [the PSI], after she so thoroughly agreed with everything in the [PSI] so she could get herself on probation and then did the exact opposite.

At this point, Audra's counsel informed the court that Audra wished to address it. Audra informed the court that she was "overwhelmed" by the situation. She noted that she was unaware of the substance of the guidelines, but "[t]he only thing I knew with certainty was that I needed to have the taxes taken care of[.]" She said that Anthony had given Edwards "direction" in filing the taxes and that she was "just the legs" in carrying out her husband's direction. She said that when her lawyer had "shared the orders with [her], [she] immediately sought to rectify" the tax returns. She also informed the court that she had power of attorney for Anthony and was "more than willing to sign those returns today" and while Anthony was in prison, she would "make sure returns are filed every year."

10

The District Court decided to revoke Audra's probation based on what it considered "not only willful delay and recalcitrance but deliberate indifference to what she knew to be the facts of the case and agreed to be the facts of the case, willful blindness and willful obstruction of these duties." It sentenced her to 11 months of imprisonment and a year of supervised release.

In an addendum to the transcript, the District Court noted:

> Bluntly stated, the Ropers find themselves prosecuted and incarcerated for one reason: Greed. Their greed was the reason for the acceptance of bribes in the utterly corrupt contract awards and ensuing cover up. The disingenuousness and deceit employed by Mrs. Roper, no doubt influenced in part by her husband, in going to an obscure "accountant" in the South Atlanta area when hundreds of more appropriate professionals are available in Richmond and Columbia Counties indicate manipulation ab initio. From the outset they contrived to avoid their obligations. It is true that some fine payments have been made, but the underlying and greater obligation with respect to taxation has not been simply ignored but denied by design. Perhaps the most astonishing aspect of this case is that the Ropers (joint tax filers from 2008 to 2014) received bribes totaling almost $200,000 during those years, they still have the money, and now they arrogantly and falsely deny their unequivocal tax liability thereon. This deliberate and willful disregard of an obvious obligation is a compelling confirmation and luminous example of Mrs. Roper's genuine motivation: not to make amends but to blatantly disregard a clear and present obligation as well as the Court's specific, direct principal condition of her probation. In sum, the greed continues.

Audra timely appealed to us.

## II. PROCEDURAL DUE PROCESS VIOLATION

Roper's first argument is that the district court violated her procedural due process rights by failing to disclose to her the evidence upon which it based its

11

ultimate sentence.  Specifically, she argues that the district court did not provide

her with a copy of the Facebook advertisement before the revocation hearing, and

never provided her with any details at all regarding the incident at Platinum in

2002 or 2003 to which the district court alluded.  This failure, she argues, was

harmful because the district court concluded, based on its impression of Platinum's

business practices, that she had attempted to manipulate the court's sentencing

conditions, and she was unable to adequately respond to its concerns.

Regarding the revocation of probation, 18 U.S.C. § 3565 provides:

> If the defendant violates a condition of probation at any time prior to
> the expiration or termination of the term of probation, the court may,
> . . . after considering the factors set forth in section 3553(a) to the
> extent that they are applicable . . . revoke the sentence of probation
> and resentence the defendant under subchapter A.

18 U.S.C. § 3565(a)(2).

We have held that, under 18 U.S.C. § 3565(a)(2), in resentencing a

defendant after a probation violation, a court is not restricted to the guideline range

applicable at the time of the initial sentencing hearing; instead, a court must only

comply with Subchapter A, which is found at 18 U.S.C. §§ 3551–59 and contains

general provisions regarding the imposition, review, and implementation of

sentences.  United States v. Cook, 291 F.3d 1297, 1300–01 (11th Cir. 2002).

Further, in resentencing after a probation revocation, a district court may revisit

facts underlying the original conviction.  United States v. Smith, 907 F.2d 133, 135

12

(11th Cir. 1990), superseded by statute on other grounds, 18 U.S.C. § 3565 (1994), as recognized in Cook, 291 F.3d at 1300 n.3.

"In a probation revocation proceeding, all that is required is that the evidence reasonably satisfy the judge that the conduct of the probationer has not been as good as required by the conditions of probation; evidence that would establish guilt beyond a reasonable doubt is not required." *United States v. Robinson*, 893 F.2d 1244, 1245 (11th Cir. 1990) (quotation omitted). Thus, upon a finding by the preponderance of the evidence that the defendant has violated a condition of probation, the district court may revoke the defendant's probation. See United States v. Cunningham, 607 F.3d 1264, 1266 (11th Cir. 2010) (discussing revocation of supervised release pursuant to 18 U.S.C. § 3583(e)); United States v. Mitsven, 452 F.3d 1264, 1266 n.1 (11th Cir. 2006) (noting that the analysis of a probation revocation proceeding is conceptually the same as a supervised release revocation proceeding).

A defendant in a revocation proceeding is certainly entitled to due process protections, though not all of the procedural protections provided to a defendant in a criminal proceeding. United States v. Copeland, 20 F.3d 412, 414 (11th Cir. 1994). The procedures to be followed in a revocation proceeding are outlined in Rule 32.1. 18 U.S.C. § 3565(a)(2); Fed. R. Crim. P. 32.1. At the final revocation hearing, the defendant is entitled to (1) written notice of the alleged violation;

13

(2) disclosure of the evidence against her; (3) an opportunity to appear, present evidence, and question any adverse witness, unless the court determines that the interest of justice does not require the witness to appear; (4) notice of the right to counsel; and (5) an opportunity to make a statement and to present any information in mitigation.  Fed. R. Crim. P. 32.1(b)(2).

Though these protections are crystallized in the Federal Rules of Criminal Procedure, they are nonetheless *constitutional* protections, not *statutory* protections.  See Morrissey v. Brewer, 408 U.S. 471, 489 (1972) (disclosure of evidence is a constitutional right to which a defendant is entitled in a revocation hearing); Gagnon v. Scarpelli, 411 U.S. 778, 782 (1973) (applying Morrissey to probation revocation hearings).  Accordingly, we conceptualize any procedural due process violations as constitutional errors.  See id.  Constitutional errors are harmless only when it appears beyond a reasonable doubt that the error did not contribute to the outcome.  United States v. Gari, 572 F.3d 1352, 1362 (11th Cir. 2009).

Because it is not apparent, beyond a reasonable doubt, that the failure to provide Roper with evidence relating to Platinum's business practices did not contribute to the outcome, we conclude that the constitutional error at issue here was sufficiently harmful to have materially violated Roper's procedural due process rights.  Though it may not be likelier than not that the district court's

14

failure here contributed to the outcome, there is substantial evidence suggesting that it did. Both at the revocation hearing and in the addendum filed by the district court to the sentencing hearing transcript, the district court concluded that Roper engaged in manipulative practices to avoid complying with Special Condition 9. Even a conservative reading of the addendum suggests that the district court's opinion of Platinum—to which it referred, with scare quotes, as an "obscure 'accountant' in the South Atlanta area"—played a role in its determination of Roper's conduct. In fact, the district court explicitly says so: Roper's patronage of Platinum "indicate[s] manipulation *ab initio*." And throughout the hearing, the district court specifically questioned Ozburn and Mathews about Platinum's business operations because, as the district court later said, it was "curious about the character of the business."

We conclude that the court erred in failing to disclose all the evidence it had considered at the revocation hearing. See Copeland, 20 F.3d at 414; Fed. R. Crim. P. 32.1(b)(2). Moreover, the failure to provide Roper with the evidence underlying the court's ultimate opinion of Platinum—which in turn played a role in its conclusion that Roper engaged in manipulative practices—was clearly prejudicial. The government's arguments to the contrary ignore the district court's own words, which unequivocally demonstrate that the omitted evidence played a significant role, though perhaps not an outcome-determinative one, in its conclusion that

15

Roper violated Special Condition 9.  Accordingly, we vacate the district court's revocation decision and remand for the district court to conduct a new revocation hearing and for resentencing, if it determines that Roper violated the conditions of her probation.

### III. JONES VIOLATION

We review *de novo* whether a district court has "elicited fully articulated objections following the imposition of sentence."  United States v. Jones, 899 F.2d 1097, 1103 (11th Cir. 1990), overruled on other grounds by United States v. Morrill, 984 F.2d 1136 (11th Cir. 1993) (en banc) (overruling Jones only to the extent that it held that bank tellers are not vulnerable victims within the meaning of U.S.S.G. § 3A1.1).

Under Jones, the district court must "elicit fully articulated objections, following imposition of sentence, to the court's ultimate findings of fact and conclusions of law."  899 F.2d at 1102.  The purpose of Jones is to elicit objections "for appellate review" and to "give the court an opportunity to correct any errors it may have made, which if corrected to the objecting party's satisfaction will render an appeal unlikely."  United States v. Irey, 612 F.3d 1160, 1245 (11th Cir. 2010).  Accordingly, we have held that questions like "is there anything further?" or "anything else?" do not satisfy this requirement.  United States v. Campbell, 473 F.3d 1345, 1348 (11th Cir. 2007).  The ordinary remedy for a Jones violation is to

16

remand for further sentencing.  899 F.2d at 1103.  However, if the record is sufficient to review the parties' objections, we will not remand but will rather consider the parties' objections *de novo*.  Campbell, 473 F.3d at 1347.

It is uncontested by the parties that the district court committed a Jones violation.  The relevant question, therefore, is whether the record is sufficient to review the parties' objections, which the government contends it is.  We note at the outset that we have exceedingly few published cases that explain when, exactly, the record is sufficient to review on appeal that a Jones violation is of no concern.  In United States v. Holloway, we held that a defendant's inability to object to the presentencing report *or* the sentence was not a "mere 'technical' violation of Jones" because "we do not have a developed sentencing record to review."  971 F.2d 675, 681 (11th Cir. 1992).  In United States v. Cruz, we held that a Jones violation—which was not raised on appeal—in which the District Court failed to elicit objections to the sentence didn't constitute reversible grounds on appeal because the issues raised on appeal had been fully articulated before the court in defense counsel's arguments.  946 F.2d 122, 123, 124 n.1 (11th Cir. 1991).  Accordingly, we determined that "the record is sufficient for meaningful appellate review."  Id. at 124 n.1.

Based on our reading of these cases, along with our own reading of the revocation hearing transcript, we conclude that the Jones violation here constituted

17

reversible error because the record does not appear to be fully developed for meaningful appellate review.  The arguments made by Roper's counsel at the hearing are not entirely coextensive with the issues that she raises before us—specifically, the violation of her procedural due process rights.  Therefore, this case is distinguishable from Cruz, where we held that the record *was* sufficient because the issues raised on appeal matched the issues argued prior to the imposition of the sentence.  946 F.2d at 124 n.1.  There, the failure to elicit objections did not impede our review because we knew what the objections would have been—they had already been raised and fully argued.  That is not the case here.  Judging from the issues raised before us now, the hypothetical objections to the district court's sentence here appear as though they would have been quite different than counsel's arguments before the imposition of the sentence.

Moreover, the failure to elicit objections was compounded by the fact that the district court attached an addendum to the revocation hearing transcript that further elaborated on the reason it revoked Roper's probation.  This addendum further expanded on the reasons given by the district court at the hearing and contained entirely new reasons—which, again, clearly indicates a basis for Roper's revocation to which she was unable to respond.

In sum, we conclude that the district court's violation of Jones constituted reversible error.  Had the court appropriately elicited objections to its sentence, it is

entirely possible that the procedural due process violation alleged by Roper would have been altogether obviated, or at least significantly mitigated. This case is an illustrative example of why, in Jones, we exercised our supervisory power over the district courts to require fully articulated objections. That requirement is inherently grounded in judicial economy, because the core purpose of eliciting objections is to aid appellate review and to provide the district court with the opportunity to resolve any objections then and there—not after remand. Irey, 612 F.3d at 1245.

## IV. CONCLUSION

We determine, based on the record before us, that the district court violated Roper's procedural due process rights and committed a Jones violation. Accordingly, we remand the case to the district court to conduct a revocation hearing anew and—if it again determines that Roper violated the terms of her probation—for resentencing on the basis of that violation.[5]

**VACATED and REMANDED.**

---

[5] In her Motion for a Stay of the Mandate and for Clarification of this Court's November 14, 2019 Opinion and Order, Roper requests that we direct the district court to "provide to [her] any and all evidence against her," including the evidence that was the subject of her appeal to us. We decline this invitation as unnecessary. We do not know what the government might do on remand, or what evidence the government might present. In any event, we can assume that the district court on remand will comply with this opinion and ensure that Roper is provided with the evidence against her and an opportunity to challenge the same.